Date signed May 21, 2007



IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
at GREENBELT

| | | | |
|---|---|---|---|
| In Re: | * | | |
| Daniel Andrew Ruppert, | * | Case No. | 05-41879-TJC |
| | * | Chapter | 7 |
| Debtor. | * | | |
| ***************************************** | * | | |
| United States Trustee, | * | | |
| | * | | |
| | * | | |
| Plaintiff, | * | Adv. No. | 05-09135-TJC |
| vs. | * | | |
| Daniel Andrew Ruppert, | * | | |
| | * | | |
| | * | | |
| Defendant. | * | | |

**MEMORANDUM OF DECISION**

Before the court is a Complaint to Deny Discharge of Debtor filed by Plaintiff W. Clarkson McDow Jr., the United States Trustee for Region Four (the "Trustee") in which the Trustee seeks the denial of the discharge of the Defendant Daniel A. Ruppert (the "Debtor"). The Trustee contends, among other theories, that the Debtor refused to obey a

1

lawful order of this Court within one year before the date of the filing of the Debtor's bankruptcy case, which was entered in a bankruptcy case of an insider of the Debtor. The Trustee contends, therefore, that the Court should deny the Debtor a discharge pursuant to 11 U.S.C. § 727 (a)(6), made applicable to this case by 11 U.S.C. § 727(a)(7). The Debtor contends that he did not refuse to obey the order because he did not know about it, and that the complaint does not otherwise establish a basis to deny him a discharge.

The Court conducted a trial on the complaint over a series of several days in February and March, 2007. For the reasons set forth herein, the Court finds and concludes that the Debtor willfully refused to obey a lawful order of this Court within one year before the date of filing of the petition in connection with a case in which the Debtor was an insider. The Court therefore concludes that the Debtor's discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(6) and (7). The Court need not address the Trustee's other theories for the denial of the Debtor's discharge.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). The following constitutes the Court's findings of fact and conclusions of law.

### I.   Findings of Fact

The Debtor was the sole owner and operator of Ruppert Family Builders, LLC ("RFB"). RFB filed a voluntary petition under Chapter 11 of the Bankruptcy Code on December 26, 2002, Case No. 02-24757–DK (the "RFB Bankruptcy Case").

RFB was a small building company that specialized in building decks on residential houses and also built several homes. At all times during the RFB Bankruptcy

2

Case, the Debtor was the responsible person in charge of RFB's operations and activities. RFB was represented in the RFB Bankruptcy Case by Jeffrey Orenstein, a bankruptcy attorney who is a member of the Maryland bar. On January 27, 2003, the Trustee appointed an official committee of unsecured creditors in the RFB Bankruptcy Case.

**A.     The Sale of the Property and the Sale Order.**

On April 28, 2004, RFB filed in the RFB Bankruptcy Case a motion to sell free and clear of liens real property located at 18900 Liberty Mill Road, Germantown, MD 20874 (the "Property"). The Property was the single, substantial asset of RFB. The purpose of selling the Property was to fund the anticipated plan of reorganization under which unsecured and other creditors would be paid. That purpose – that the Property would be sold to fund the plan – had been discussed between Mr. Orenstein and the Debtor, as Mr. Orenstein put it, since "day one of the case." The Debtor knew that the purpose of selling the Property was to fund the plan of reorganization.

The Court held a hearing on the motion to sell the Property, which was attended by the Debtor. The motion was granted by the Court. In granting the motion, the Court entered on May 20, 2004 in the RFB Bankruptcy Case the Order Authorizing the Sale of Real Property (the "Sale Order"). The Sale Order is the order that the Trustee contends the Debtor willfully violated.

The Sale Order provided that at the closing of the sale of the Property, RFB was authorized to pay customary sales expenses and liens against the Property. The Sale Order further provided that the "balance of funds, if any, shall be held by [RFB] subject to further order of the Court."

RFB closed on the sale of the Property and received net sales proceeds of $163,404.06 (the "Sale Proceeds"). Katherine Breesman Harper, an employee of RFB at the time, picked up the settlement check constituting the Sales Proceeds from Mr. Orenstein's office. At the instruction of the Debtor, she deposited the check in the RFB debtor-in-possession operating account.

**B.     The Dissipation of the Sale Proceeds.**

Rather than retain the Sales Proceeds, RFB, under the direction of the Debtor, spent the Sale Proceeds. The funds were spent during the six month period from July 2004 through December 2004. The Debtor testified that the Sales Proceeds were spent on ordinary and necessary expenses of RFB. The Debtor submitted into evidence RFB's bank statements and copies of cancelled checks in an effort to show what happened to the Sale Proceeds. The Debtor contends that RFB was on the cash basis of accounting and that all revenues were deposited into, and all expenses were paid through, the checking account. The Debtor contends therefore that the amount by which withdrawals from the RFB's checking account exceeded deposits each month, or vice versa, constituted the net loss or net profit for the month, as the case may be. Under this format, the Debtor contends that RFB's net loss (or in the case of August 2004, net profit) for each month from July 2004 through December 2004, was approximately as follows[1]:

   July, 2004     $32,111  (loss)

   August, 2004    $12,199.55 (profit)

---

[1] The Debtor made several attempts to account for the use of the Sale Proceeds. Compare PX 22 with DX 11. The amounts that the Debtor characterized as net loss or net profit for each month differed somewhat among those accounts, but the difference is not material for purposes of this decision. Count III of the complaint seeks to deny the Debtor a discharge for allegedly failing to adequately explain the loss of the Sales Proceeds. See 11 U.S.C. § 727(a)(5). The Court makes no determination on this claim.

4

| | | |
|---|---|---|
| September, 2004 | $24,859.61 | (loss) |
| October, 2004 | $33,483.52 | (loss) |
| November, 2004 | $74,272.43 | (loss) |
| December, 2004 | $3,482.47 | (loss) |
| Total: | $156,010.44 | (loss) |

The Debtor admits that a substantial portion of the Sale Proceeds was paid to him directly or for his benefit. By the Debtor's own accounting, the amount of the Sale Proceeds that were paid to or for the benefit of the Debtor personally during the period was approximately as follows[2]:

| | |
|---|---|
| July, 2004 | $14,358 |
| August, 2004 | $ 7,724 |
| September, 2004 | $ 9,440 |
| October, 2004 | $12,881 |
| November 2004 | $11,556 |
| December, 2004 | not available |
| Total: | $55,959 |

Accordingly, during the five month period of July, 2004 through November, 2004, the Debtor had RFB pay to him or makes payments for his personal benefit funds in the total approximate amount of $ 55,959. In addition, additional funds were paid to or for the benefit of the Debtor in December 2004, although the amount of those funds is not available.

---

[2] As stated supra at n.1, the Debtor made several attempts to account for the use of the Sale Proceeds, including the amounts paid to him or for his personal benefit. The amounts paid to or for the benefit of the Debtor differ somewhat in those accounts, but the difference is not material for purposes of this decision. The amount paid to or for the benefit of the Debtor in December 2004 is not available because the individual checks from the RFB debtor-in-possession checking account are not available.

The record was not particularly clear as to what the Debtor's salary from RFB was before it received the Sales Proceeds. It appears that the usual biweekly payroll check issued to the Debtor from RFB was $3,082. On that basis, payments of $55,959 over a five month period would be substantially more than the Debtor was previously receiving. Further, payments of $55,959 over a five month period would be equivalent to more than $134,000 on an annual basis. While such an amount appears plainly excessive in light of the operations, revenue and lack of profitability of RFB, the Court need not make this particular finding for purposes of this ruling. For purposes of this ruling, it is sufficient to note that the Debtor paid himself a substantial sum each month while the Sales Proceeds continued to be depleted.

**C.    The Debtor's Understanding of the Sale Order Obligations**

As explained further in the Conclusions of Law, the primary dispute between the parties centers on the Debtor understanding of the Sale Order and whether he willfully violated its terms. The key witnesses concerning these issues were Mr. Orenstein and Ms. Harper, although as explained further in the Conclusions of Law section, the Debtor also testified on these issues.

Ms. Harper's understanding of RFB's obligations with respect to the Sales Proceeds, and more importantly, her statements of the Debtor's understanding of his duties and obligations with respect to the Sale Proceeds, differed dramatically from her examination under Fed. R. Bank. P. 2004 to her trial testimony. At trial, she testified that some time after the Sale Order was entered, she was not sure when, she acquired a vague understanding from the Debtor that the Sale Proceeds could not be spent.

In Ms. Harper's Rule 2004 examination, however, she testified as follows:

6

Q. What is your understanding of what that [the phrase in the Sale Order that the "balance of funds, if any, shall be held by [RFB] subject to further order of the Court"] means?

A. The money should have stayed in the bank and not ever been spent.

Q. Did anyone ever tell you that before today?

A. I believe Mr. Orenstein did.

Q. Was that back when you got the check?

A. I believe so. I'm not 100 percent.

Q. Did you ever mention that to Mr. Ruppert?

A. Yes. I think that we were both – it was kind of understood that that [the Sales Proceeds] was to go to the creditors.

\* \* \* \* \* \* \*

Q. So at the time you got the $160,000 you were aware that that money was for creditors and that it was to be set aside?

A. Correct. Yes sir.

\* \* \* \* \* \* \*

Q. So on the same day you deposited the check that you knew was to be held for creditors you wrote checks out that you knew couldn't clear other than the fact that you had just deposited the sales check?

A. Correct.

Q. And you knew you were supposed to hold that money?

A. Pretty much, yes.

Q. So why were you writing checks out to disburse that money on the same

7

        day you deposited it?

A.     I was following orders.

Q.     From Mr. Ruppert?

A.     Yes

Ms. Harper's explanation for the change in her testimony was that she was intimidated at the Rule 2004 examination – her first – into accepting the leading questions of the examiner. She also testified that she hadn't been "prepared" before her examination. But at trial, Ms. Harper was a poised witness, who was well able to articulate her thoughts and defend her statements. She did not appear to be intimidated by the trial proceedings and did not seem to be the type of person who is easily intimidated. Further, the examination questions were clear and fair. A number of her answers at the examination, such as "I think that we [she and the Debtor] were both – it was kind of understood that [the Sales Proceeds] was to go to the creditors," were not a simple one word acquiescence to a leading question. At trial, Ms. Harper testified that she answered the questions at the examination as best she could at the time.

The Court finds Ms. Harper's account of the Debtor's and her understanding of the limitations on the use of the Sale Proceeds, made at her Rule 2004 examination, as set forth above, to be a candid explanation of the Debtor's understanding, as relayed to her, of those limitations. The Court accepts Ms. Harper's Rule 2004 testimony in its Findings of Fact.

With respect to Mr. Orenstein's testimony, as stated above, Mr. Orenstein represented RFB in the RFB Bankruptcy Case. He has practiced law for 20 years. Approximately 50% of his practice is in the area of bankruptcy law.

Mr. Orenstein testified that he and the Debtor discussed the Sale Order after it was entered in a conversation that "is as vivid in my mind today as it was the day we had it." The Debtor initiated the call to Mr. Orenstein after the Debtor received the Sale Order, to discuss the terms of the Sale Order. Mr. Orenstein told the Debtor that the Debtor was "to keep the money and not to spend it." Mr. Orenstein told the Debtor that he did not need to separately segregate the funds. The Debtor asked Mr. Orenstein, "What if I blow the money?" Mr. Orenstein specifically recalled this question because he thought it was bizarre. He told the Debtor, "Don't blow it, Danny, don't."

**D.     RFB Filings in the RFB Bankruptcy Case Concerning the Sale Proceeds**.

On May 17, 2004, Mr. Orenstei, on behalf of RFB in the RFB Bankruptcy Case, filed a consent motion to extend deadline for filing plan and disclosure statement. The consent motion seeks an extension of time for RFB to file its plan and disclosure statement. It describes that the Court has previously approved the sale of the Property and that the sale is scheduled to close on June 14, 2004. It states "If the sale is consummated, the Debtor will have propose [sic] a plan that will provide for prosecution of avoidance actions, objections to claims, and distributions of the net sales proceeds to creditors." Mr. Orenstein testified that it is his practice to send copies of case filings to his clients and believes he sent a copy of the consent motion to the Debtor.

On or about June 22, 2004, shortly before RFB filed its plan and disclosure statement, Mr. Orenstein and the Debtor discussed whether the RFB Bankruptcy Case should be converted to a case under Chapter 7. Mr. Orenstein's time records reflect that the conversation was approximately 18 minutes. The point of the conversation was that, because the creditors were going to receive the Sale Proceeds in any event, it might be

more efficient to simply convert the case and have a Chapter 7 trustee appointed who could resolve claims and make a distribution to creditors. It was decided not to convert the RFB Bankruptcy Case and to file a plan and disclosure statement. The conversation is significant, however, because it is yet another indication that the Debtor knew the Sale Proceeds were to be used to pay creditors.

On June 29, 2004 RFB filed a plan of reorganization and a disclosure statement in the RFB bankruptcy case. The first page of the plan provides:

> The Plan provides for the payment of all administrative expenses and payment of the claims of priority and general unsecured creditors from the proceeds obtained from the sale of the [RFB's] real property located at 18900 Liberty Mill Road, Germantown, MD 20874 . . .

The plan further provides on page 5 that "this plan is to be funded from the proceeds of the sales proceeds. . . . The Bankruptcy Court previously approved the sale of the Liberty Mill Property and the net proceeds from the sale were approximately $162,000." Under the plan, the terms "sales proceeds" is a defined term to mean "the approximately $162,000 resulting from the sale of the Liberty Mill property."

The RFB disclosure statement for plan of reorganization describes at length the sale of the Property. It further provides

> From the proceeds received by the Debtor at the closing of the sale, the Debtor paid customary sale expenses, and all liens on the Liberty Mill Property including unpaid real property taxes, and all amounts to do under the mortgage held by Investors Mortgage Services LLC in accordance with the consent order regarding motion for entry of order pursuant to settlement agreement granting relief from automatic stay to permit foreclosure of real property entered March 18, 2004. <u>The balance of funds, approximately $162,000, are being held by the debtor subject to further order of the Bankruptcy Court. (Emphasis added).</u>

The plan and disclosure statement were filed with the bankruptcy court electronically. Each document has a signature line for the Debtor as follows "By: /s/ Daniel A. Ruppert" as the managing member of RFB.

Mr. Orenstein's daily time log for June 29, 2004, the day he filed RFB's plan and disclosure statement, reflects the following entry: ".3 mw D. Ruppert re Plan." The initials "mw" were Mr. Orenstein's standard usage for the abbreviation for "met with." The entry meant that Mr. Orenstein met with the Debtor for approximately 3/10 of an hour on June 29, 2004. Mr. Orenstein was certain, and the Court accepts, that the Debtor signed the Plan.[3]

## II. Conclusions of Law

Under Section 727 "the court shall grant the debtor a discharge" unless one of twelve exceptions is present. See 11 U.S.C. § 727(a)(1)-(12). "Obtaining a discharge is the key component of the 'fresh start' a bankruptcy proceeding is designed to give a debtor." Missouri ex rel. Nixon v. Foster (in re Foster), 335 B.R. 709, 714 (Bankr. W.D. Mo. 2006). To that end, "the provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor." Collier on Bankruptcy P 727.01[4] (15th ed. Rev. 2006). The party seeking the denial of the debtors discharge has the burden of proving the claim by a preponderance of the evidence. Farouki v. Emirates Bank Int'l, 14 F.3d 244, 250 (4th Cir. 1994).

In the instant case the Trustee seeks denial of the Debtor's discharge pursuant to Sections 727(a)(2),(5) and (6) which are applicable in this case pursuant to Section 727(a)(7). Under Section 727(a)(7), a debtor can be denied a discharge if "the debtor has

---

[3] Mr. Orenstein's time records have a second entry on June 29, 2004 for time spent filing and serving the plan.

11

committed any act specified in paragraph (2),(4),(5), or (6) of this subsection on or before one year before the date of the filing of the petition or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider." 11 U.S.C. § 727(a)(7). In the instant case the Debtor has admitted that he is an insider of RFB for purposes of Section 727(a)(7). Thus, the Trustee must establish that the Debtor committed an act specified in Sections 727(a)(2),(5), or (6) within one year of his filing the petition in his bankruptcy case.

"A party objecting to discharge need prove only one of the grounds for nondischargeability under § 727(a) because the provisions of § 727(a) are phrased in the disjunctive." Farouki, 14 F.3d at 250. Denial of a discharge pursuant to one provision of Section 727(a) eliminates the need for consideration of the remaining claims. Id. (citing In re Shumate, 55 B.R. 489, 495 (Bankr. W.D. Va. 1985); In re Moore, 89 B.R. 935, 937 (Bankr. M.D. Fla. 1988)). Therefore, because the Court concludes that the Debtor's discharge should be denied pursuant to Section 727(a)(6)(A), the Court does not consider the remaining counts under the complaint, namely, the counts under Sections 727(a)(2) and 727(a)(5).

The Court therefore turns to Section 727(a)(6)(A). That section requires that a debtor be denied a discharge if

> the debtor has refused, in the case-
> (A) to obey any lawful order of the court, other than an order to respond to a material question or to testify;

11 U.S.C. § 727(a)(6)(A).

The actual matter in dispute between the parties with respect to the Section 727(a)(6)(A) claim is quite narrow. There is no dispute that the Sale Order required that

12

RFB was to hold the balance of the Sale Proceeds, subject to further order of the Court, and not spend the Sale Proceeds.  Further, there is no dispute that the Debtor had the Sale Proceeds deposited into the RFB debtor-in-possession bank account and, contrary to the express provisions of the Sale Order, spent the money.  Finally, there is no dispute that some or all of the funds were spent in the one year period prior to the date of the filing of the Debtor's bankruptcy petition. Thus, there is no dispute that the Sales Order required RFB to hold, and not spend, the Sale Proceeds, nor is there any dispute that the RFB, under the direction of the Debtor, failed to comply with it.

The parties, however, dispute whether the Debtor willfully violated the Sale Order.  The Trustee contends that the Debtor knew of the prohibition in the Sale Order against spending the Sale Proceed and willfully refused to comply with its terms. The Debtor contends that he did not see the Sale Order and did know that the Sale Order prevented him from using the proceeds in the operation of RFB's business.  He contends that Mr. Orenstein was not clear in his instructions to the Debtor concerning the limitations on spending the funds.  He alleges that the funds were spent, more or less, on RFB's business expenses (although he acknowledges that he spent at least $55,959 (plus the December amounts) of the funds for his personal benefit).

Section 727(a)(6)(A) provides for the denial of a debtor's discharge if that debtor "refuses" to obey a lawful court order.  The term "refuse" is not defined in the Bankruptcy Code. "Refuse" means "to deny, decline, reject." BLACK'S LAW DICTIONARY 887 (6th ed. 1991).  "Fail is distinguished from 'refuse' in that 'refuse' involves an act of the will, while 'fail' maybe an act of inevitable necessity."  Id. Nonetheless, Courts diverge on whether the statutory term "refused" requires an element

of willfulness or intent. See In re Gentry, 275 B.R. 747, 754 (Bankr. W.D. Va. 2001) (identifying the diverging opinions); Foster, 335 B.R. at 716 (finding that a court must find that a debtor's lack of compliance with a court order was willful and intentional because "[t]he term used in the statute [11 U.S.C. § 727(a)(6)] is 'refused' not 'failed.'"); Hunter v. Magack (In re Magack), 247 B.R. 406, 409-10 (Bankr. N.D. Ohio 1999) (holding that "the use of the word 'refused' in § 727(a)(6) denotes that an action brought under this section should, in substance, simply be treated as a civil contempt proceeding thereby implicitly negating the intent requirement from the word 'refuse' as willfulness is not an element to a proceeding in civil contempt.").

For the reasons set forth below, the Court finds that the Debtor willfully failed to obey the Sale Order. Accordingly, it is not necessary to determine whether a claim under Section 727(a)(6)(A) can be made out without a showing of willfulness.[4]

"The word 'willful' is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). "In common usage the word 'willful' is considered synonymous with such words as 'voluntary,' 'deliberate' and 'intentional.'" Id. Willful is defined by Black's Law Dictionary as "proceeding from a conscious motion of the will; voluntary; knowingly; deliberate. Intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary." BLACK'S LAW DICTIONARY 1103 (6th ed. 1991).

---

[4] The Trustee stipulated at trial that, for purposes of this case, a party seeking to deny a debtor's discharge under Section 727(a)(6) must show that the debtor willfully did not comply with the relevant court order.

14

A debtor's willful intent to disobey a court order can be inferred from his conduct. See, In re Dowell, 61 B.R. 75, 78 (Bankr. W.D. Mo. 1986) ("If the evidence establishes that the debtor knew or should have known of the multitude of orders and notices sent to her and disregarded them, it could hardly be said that her failure and refusal to attend or to perform other duties imposed by the court was inadvertent or simply by mistake.").

In this case, Mr. Orenstein's testimony established that the Debtor well knew, from "day one" of the case, that RFB's case strategy was to sell the Property and pay the creditors from any generated surplus. The Property was in fact sold and the Sale Order required that the Sales Proceeds be held by RFB pending further order of the Court, consistent with that case strategy. The Debtor also knew, after the Sale Order was entered, that the Sale Proceeds were to be used to pay creditors, as evidenced by, among other things, his express conversation with Mr. Orenstein on June 22, 2004, about whether or not to convert the case to Chapter 7.

More critically, Mr. Orenstein had an explicit conversation with the Debtor about the terms of the Sale Order after the Debtor received the Sale Order. That testimony established that the Debtor knew of the Sale Order and knew of the prohibition against spending the Sale Proceeds in the Sale Order, and the Court accepts that testimony in its findings. See supra, Findings of Fact at p. 9.

Further, RFB's plan of reorganization expressly provided that the Sale Proceeds were to be used to pay creditors. The disclosure statement expressly stated that RFB was holding the Sale Proceeds subject to further order of the Court. See supra, Findings of Fact at p. 9-10. The Debtor and Mr. Orenstein met on June 29, 2004, the day Mr. Orenstein filed the plan. While the Debtor contends that an eighteen minute meeting is

15

not long enough for Mr. Orenstein to properly explain the plan and disclosure statement, the plan is a very simple plan that had at its core that the Sale Proceeds would be used to pay creditors. Especially considering that this had been the case strategy since "day one," eighteen minutes or so was sufficient time for Mr. Orenstein to again advise the Debtor that the Sale Proceeds were to be used to fund the plan. Thus the language in the plan and disclosure statement fully supports and corroborates Mr. Orenstein's testimony that the Debtor knew of the prohibition against spending the Sale Proceeds in the Sale Order.

Additionally, the Court accepts Ms. Harper's Rule 2004 examination testimony as a more credible account – as compared to her trial testimony - of the understanding of the Debtor's on the prohibition against spending the Sale Proceeds. Ms. Harper's Rule 2004 examination testimony was candid, the questions were clear and fair, and her answers were given before she was "prepared." See supra, Findings of Fact, at p.6-8. She stated explicitly that "Yes. I think that we [she and the Debtor] were both – it was kind of understood that that [the Sales Proceeds] was to go to the creditors."

Based on the testimony of Mr. Orenstein and Ms. Harper, and the documentary evidence, the Court finds and concludes that the Debtor was aware of the prohibition in the Sale Order against spending the Sale Proceeds and willfully ignored that prohibition.

Finally, the foregoing findings and conclusions based on the testimony of Mr. Orenstein and Ms. Harper are sufficient to establish a claim under Section 727(a)(6)(A). The Court notes, however, the Debtor testified that Mr. Orenstein only told him not to "blow" the Sale Proceeds, and that the Debtor understood that to mean he could not "lose" or "deplete" the Sale Proceeds. Nevertheless, the Debtor did lose and deplete the Sale Proceeds. Indeed, the Debtor's own trial exhibits showed that each month from July

16

2004 through December 2004, except for August, RFB's bank statements reflected that the Sale Proceeds were dwindling substantially. Thus as each month went by, the Debtor continued to spend the Sale Proceeds while the Debtor knew from the bank statements the funds were being depleted. Further, much of that depletion was due to the Debtor paying himself in excess of $55,000 for five of those months.

In light of the Court's findings based on the testimony of Mr. Orenstein and Ms. Harper, the Court need not determine whether the Debtor's continued spending of the Sale Proceeds, while he knew from the bank statements that the funds were being depleted, alone establishes a claim under Section 727(a)(6)(A). Stated otherwise, the Court need not decide whether, if it were to disregard Mr. Orenstein's testimony, Ms. Harper's Rule 2004 examination testimony, and the documentary evidence, the Debtor's testimony about his purported understanding of the limitation on spending the Sale Proceeds (i.e., that he could spend the Sale Proceeds but not lose or deplete them, as opposed to not spending them at all) makes out a claim under Section 727(a)(6)(A). The Court notes, however, that the Debtor's testimony established, at the very least, that the Debtor violated his own purported understanding of the limitation on spending the Sale Proceeds. Further, he did so despite receiving RFB's bank statements each month that plainly showed the funds were being depleted, and while benefiting himself personally. These actions hardly are compatible with the fiduciary duties imposed on a responsible person in a Chapter 11 bankruptcy proceeding.

### III.    CONCLUSION

For the foregoing reasons, the Court shall enter an order denying the Debtor a discharge.

Copies to:

Plaintiff's Counsel
Defendant
Defendant's Counsel

**END OF ORDER**